12M-5061-JSD

## AFFIDAVIT OF SPECIAL AGENT PAUL SANTANA

1. I am a Special Agent with the Federal Bureau of Investigation (FBI). I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code. I have worked for the FBI since 2009. I am currently assigned to the Violent Crimes Task Force and have worked there since May of 2010. Since becoming a Special Agent with the FBI, I have participated in numerous investigations of violent crimes, including kidnappings and extortions.

2. I submit this affidavit in support of an application for a criminal complaint charging ALFRED VAZQUEZ and EDGAR ACEVEDO with conspiracy to commit kidnapping, in violation of Title 18, United States Code, Section 1201(c). Based on the information contained herein, I submit that there is probable cause to believe that VAZQUEZ and ACEVEDO committed the crime set forth in the accompanying criminal complaint.

3. I am familiar with the underlying investigation and I have spoken to numerous other agents who have participated in the investigation. This affidavit does not set out all of the information developed during the course of the investigation. Rather, it sets forth facts which I believe to be sufficient to establish that VAZQUEZ and ACEVEDO have committed the crime set forth in the accompanying criminal complaint.

## BACKGROUND OF THE INVESTIGATION

4. On January 30, 2012, at approximately 9:35 P.M., two men armed with a firearm forcibly abducted a victim, hereinafter identified as Victim A, from the front passenger seat of a gray 2004 Mitsubishi Gallant at the intersection of Sylvia Street and Washington Street in

Boston.[1] Victim A's father in law was the driver of the car and reported the kidnapping to the Boston Police. Thereafter, the FBI began to conduct an investigation into the kidnapping of Victim A.

5. On January 31, 2012, at approximately 12:54 a.m., the kidnappers used the victim's cellular telephone to contact the wife of Victim A, who was outside of Massachusetts at the time of the call. During a series of phone calls between Victim A's phone and Victim A's wife's phone, the kidnappers demanded $100,000 for the safe return of Victim A. The kidnappers originally gave Victim A's family a deadline of February 1, 2012 to pay the ransom.

6. On February 1, 2012, Special Agent Michelle Morey, an FBI Crisis Negotiator, spoke to a family friend of Victim A. The friend advised Special Agent Morey that he had spoken to the kidnappers for approximately 20 minutes and that they extended the deadline until February 3, 2012. The kidnappers demanded that Victim A's wife make a payment toward Victim A's safe return. The friend advised that the kidnappers said that, once Victim A's wife returned to Boston, she would be given instructions as to what to do next. The friend also said that he spoke to Victim A for about ten minutes. Victim A reported that he was fine but scared.

7. Early on the morning of February 3, 2012, Victim A's wife returned to Boston with a portion of the ransom demand. Throughout the day, other persons connected to Victim A provided additional funds for the ransom. These funds totaled approximately $100,000. Victim A's wife awaited further instructions from the kidnappers.

8. At approximately 9:30 p.m., Victim A's wife received a call on her cell phone

---

[1] The identity of Victim A is known to me. This investigation is ongoing. Victim A has expressed to agents that he fears that his life is in danger. Based on the information developed during the course of this investigation, I believe that Victim A has reason to fear for his safety. Therefore, I have not included Victim A's name in this affidavit.

from the kidnappers. Victim A's wife asked for proof that Victim A was alive and spoke to Victim A. Victim A was instructed to drive west on the Massachusetts Turnpike. At approximately 10:30 p.m., Victim A's wife was equipped with a radio transmitter which allowed agents to listen to her conversations in real time. Victim A's wife was provided a car equipped with a GPS device. Victim A's wife got into the car and drove west on the Massachusetts Turnpike. Agents followed Victim A's wife. While en route, she received instructions from the kidnappers to get off at Exit 10. The kidnappers called Victim A's wife's cell phone several times after she got off the Turnpike, giving her instructions about where to go and when to turn.

9. On February 4, 2012, at approximately 12:40 a.m., Victim A pulled into a convenience store parking lot near the Dressler Hill Farm Dairy, located on Dressler Hill Road and Saundersdale Road in Charlton, Massachusetts. Several men were present at that location. One of the men instructed Victim A's wife to place the ransom money in the bed of a truck. The man counted the money and handed the money off to a man in another car. Victim A's wife was told to drive down the road, pull over, and wait for further instructions. One of the kidnappers told her Victim A would be returned to her at the same location as the money drop.

10. Agents maintained surveillance on the car with the ransom money, later identified as a Ford Expedition, as it traveled at a high rate of speed on Route 495 toward Lawrence, Massachusetts. As the Expedition traveled toward Lawrence, Victim A's wife received a phone call from Victim A from a cell phone with a blocked number. Victim A told his wife that the kidnappers would drop him off at South Bay Plaza in Boston. Under surveillance, Victim A's wife drove back to a location near South Bay Plaza in Boston. Victim A never arrived.

11. At approximately 2:30 a.m., agents followed the Expedition to 464 High Street, a two family home located near the intersection of High Street and Highlawn Avenue in Lawrence.

Agents observed men enter the building. While on surveillance, agents also saw individuals leave the address, enter the Expedition, and proceed to an address in the area of 143 Farmham Street in Lawrence. Agents then saw the car come back to 464 High Street in Lawrence.

12. At approximately 5:45 a.m., agents entered one of the common doorways at 464 High Street and knocked on the door to the first floor apartment. While agents were knocking on the first floor apartment, another agent examined the exterior of the Expedition, now parked again in front of 464 High Street. Before the money drop to the kidnappers, a portion of the ransom money was coated in fluorescent fingerprint powder which is visible when exposed to black light. When agents shined a black light on the exterior of the car, they observed fingerprint powder on the passenger side door of the Expedition. This information was relayed to agents inside 464 High Street. A later, more thorough examination of the exterior of the Expedition identified fingerprint powder on the driver's side door as well.

13. Agents at the door to the first floor apartment were met by a teenage girl who allowed agents to enter the apartment. Once inside, agents spoke to ALFRED VAZQUEZ. Also present in the apartment were VAZQUEZ's wife, Aileen Cordero, and a small child. Agents asked VAZQUEZ if they could sit and talk with him for a minute about a kidnapping investigation they were conducting. When VAZQUEZ sat down in the living room, agents saw the bag used for the ransom money on the couch next to where he was seated. The bag was empty. Agents then scanned VAZQUEZ's hands with black light and detected fingerprint powder on his hands. Among other statements, VAZQUEZ acknowledged that he was in the Expedition when it traveled from Charlton to 464 High Street and that he had handled the money in the ransom bag. He denied knowing who the victim was and did not tell agents where the victim was located. VAZQUEZ was then read Miranda warnings and placed under arrest.

Pursuant to a federal search warrant, the bag that originally contained the ransom funds was recovered at 464 High Street.

14. Agents also spoke to the landlord of 464 High Street, who lived in the apartment on the second floor. The landlord told agents that he rented the first floor apartment to VAZQUEZ and his family. The landlord also told agents that two men were in his apartment and he did not know who they were. The two men then walked down a set of stairs from the second floor to the first floor. Agents handcuffed both men for agent safety. Agents shined a black light on the hands of both men. Agents detected fingerprint powder on the hands of one of the men, EDGAR ACEVEDO. Agents determined that there was a back staircase with access to both the first floor and second floor apartments. The landlord also told agents that the white Ford Expedition was the only car he had seen VAZQUEZ and his wife use. A check of the Expedition, Massachusetts registration number 151 NT5, determined that the car was registered to Aileen Cordero, VAZQUEZ's wife. Cordero's driver's license listed an address of 143 Farnham Street in Lawrence. As previously noted, agents had seen the Ford Expedition travel to the area of 143 Farnham Street earlier in the evening.

15. Agents ran VAZQUEZ's name and date of birth and determined that he had a Massachusetts driver's license. The license listed an address of 152 Farnham Street in Lawrence. Agents went to 152 Farnham Street in Lawrence. When they arrived, agents knocked on the front door, then opened the door, identified themselves, and called out that they would like to speak to the occupants. At that time, agents heard a voice from inside the house. Agents called out so that the person inside the house could follow their voices to the door. A short time later, agents saw Victim A feeling his way toward the door. Agents led Victim A out of the house. Agents noted that Victim A's eyes were covered with duct tape and agents removed the tape.

Lawrence Police Department SWAT team conducted a protective sweep of the house and determined that no one else was present. Agents then waited for a search warrant for 152 Farnham Street. Pursuant to a federal search warrant, agents recovered the victim's jacket with what appeared to be residue of duct tape on it. Agents also recovered what appeared to be balled up rolls of duct tape.

16. Agents interviewed Victim A. Victim A told agents that on January 30, 2012, he was driving with his father in law in Boston when a man jumped in front of the car, pointed a gun at him, and ordered him out of the car. Another kidnapper went to the driver's side of the car. The man hit him, pushed him into a minivan and ordered him to sit in between the seats in the back of the van. The man then sat on him as the van took off. When Victim A's father in law tried to follow the van, Victim A heard one of the kidnappers say, "Have her cut him off." Victim A's father in law reported to police that he had tried to follow Victim A but another car swerved in front of him and prevented him from following him. Victim A believed he had been held at one location since his kidnapping.

17. Agents have also obtained a federal search warrant for VAZQUEZ's Ford Expedition and towed the Expedition to a secured location. That federal search warrant will be executed in the near future with the assistance of evidence technicians.

## CONCLUSION

18. WHEREFORE, I respectfully suggest that there is probable cause to believe that ALFRED VAZQUEZ and EDGAR ACEVEDO were members of a conspiracy to kidnap Victim A and that the kidnappers utilized Victim A's cell phone, a facility of interstate commerce, and other cell phones in furtherance of the offense, all in violation of Title 18, United States Code, Section 1201(c).

Signed under the pains and penalties of perjury this __ day of February, 2012.

_____
PAUL SANTANA
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me this 5th day of February, 2012.

_____
THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS